**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KAREN M. BECKER,            :
                                 :
        **Plaintiff**,        :
                                 :
   **v.**                  :     **Civil Action No.**
                                 :     **03-1668 (GK)**
THE WEINBERG GROUP, INC.   :
PENSION TRUST, <u>et al.</u>,     :
                                 :
        **Defendants.**    :

<u>**MEMORANDUM OPINION**</u>

Plaintiff, Karen M. Becker, a former employee of The Weinberg Group, Inc., brings this suit alleging, <u>inter alia</u>, breaches of fiduciary duty and a failure to pay pension benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 <u>et seq.</u> Defendants are The Weinberg Group, Inc. Pension Trust (the "Plan"); Myron and Arlyne Weinberg;[1] Matthew Weinberg, who is the son of Myron and Arlyne Weinberg;[2] The Weinberg Group, Inc. (the "Company");[3] and the Pension Benefit Guaranty Corporation ("the PBGC").

---

[1] Plaintiff is suing Myron and Arlyne Weinberg individually, and in their official capacity as Trustees of The Weinberg Group, Inc. Pension Trust.

[2] Plaintiff is suing Matthew Weinberg individually, and in his official capacity as Fiduciary of The Weinberg Group, Inc. Pension Trust.

[3] Plaintiff is suing the Company as Plan Administrator of The Weinberg Group, Inc. Pension Trust.

Plaintiff claims that the Company and the individual Defendants made a number of improper distributions to Plan participants between 1996 and 2000. As a result of these distributions, the Plan was underfunded when Plaintiff requested a lump sum distribution of her benefit. Consequently, the Company, as Plan Administrator, required her to pledge collateral greater than her benefit amount in order to receive her lump sum payment. She brought this action on behalf of herself, seeking an unrestricted lump sum distribution of her benefit, and on behalf of the Plan, seeking damages as a result of the improper distributions. The Company has since given her an unrestricted benefit payment of $484,194.98. Plaintiff claims she is entitled to a further $207,260.02.

This matter is currently before the Court on the following motions: Plaintiff's Motion for Partial Summary Judgment [Dkt. No. 38], Plaintiff's Motion for Partial Summary Judgment on the Disputed Benefit Amount [Dkt. No. 58], Defendant's (Plan) Motion for Summary Judgment [Dkt. No. 59], Defendants' (Company and individual Defendants) Motion for Partial Summary Judgment [Dkt. No. 60], and Defendant's (PBGC) Motion to Dismiss [Dkt. No. 73]. Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, and for the reasons stated below, the Court rules as follows.

Plaintiff's Motion for Partial Summary Judgment [Dkt. No. 38] is **denied**, Plaintiff's Motion for Partial Summary Judgment on the Disputed Benefit Amount [Dkt. No. 58] is **denied**, Defendant's (Plan) Motion for Summary Judgment [Dkt. No. 59] is **granted**, Defendants' (Company and individual Defendants) Motion for Partial Summary Judgment [Dkt. No. 60] is **granted,** and Defendant's (PBGC) Motion to Dismiss [Dkt. No. 73] is **granted**.

I.   **BACKGROUND**

   A.   **Factual History and Major Contentions**[4]

The Company provides testing and research services primarily to businesses seeking regulatory approval for their products or operations.   It also helps customers improve manufacturing processes and defend their products in court and the media.   It has approximately 75 employees.   Myron Weinberg was the Chief Executive Officer of the Company until 1997.   His son, Michael Weinberg, succeeded him as CEO.   Arlyne Weinberg was the President of an affiliated company that also participated in the Company's Plan.

Plaintiff was employed with the Company from September 1, 1990 until February 28, 2002.   She was 47 years old when she left. According to her Affidavit, her income from employment with the Company ranged from $352,297.52 to $852,145.10 between 1996 and 2001.   From 1998 until 2002, Plaintiff was employed as a director

---

   [4] Unless otherwise noted, the facts set forth herein are undisputed.

and officer of the Company.  As a Company employee, she was a participant in the Company's Plan.  The Company served as the Administrator of the Plan.

The Plan is a defined benefit plan.  Under a defined benefit plan, an employee is entitled to a fixed payment upon retirement, the amount of which is determined based on a formula incorporating factors such as salary history and duration of employment.[5]  See 29 U.S.C. § 1002(35).  Because the payments are fixed, beneficiaries are not entitled to any plan assets exceeding the amount of their benefits.

Under the terms of the Company's Plan, each participant is entitled, upon retirement or termination, to vested benefits that accrue based on compensation and years of service, as well as certain other factors not relevant to these proceedings.  The Plan documents provide several options for distribution of benefits to participants, including a lump sum distribution upon termination of employment with the Company.

On December 11, 1998, the Company adopted Plan Amendment No. 3 ("Amendment No. 3"), which states:

> BE IT RESOLVED that effective as of December 31, 1998, all benefits accrued to Plan participants as of such date will be frozen and no further benefits will accrue under the Plan to participants after such date.

---

[5] In a defined contribution plan, by contrast, employees (and their employers) may contribute to the funding of their benefit, typically by contributing a fixed percentage of their salaries.

-4-

Dkt. No. 58 Ex. D.[6]   On December 19, 1998, the Company issued a
notice to all Plan participants stating:

> This notice is to inform you that benefits attributable
> to the Weinberg Consulting Group, Inc. Pension Trust will
> be frozen effective December 31, 1998.  This means that
> services performed only through December 31, 1998 will be
> included in the calculation of your accrued benefit.
> Thereafter, no further benefits will be earned under the
> Pension Trust, and hours of service performed and
> compensation earned after December 31, 1998, will not be
> included in the calculation of your accrued benefit.

Dkt. No. 58 Ex. F.

Each year since 1998, the Statement of Plan Benefits provided
to Plan participants has reiterated that Plan benefits were frozen
as of December 31, 1998, and has stated, with minor variations,
that "[t]he amount of [a participant's] Accrued Benefit depends
upon [the participant's] years of service and the history of [the
participant's] compensation with The Weinberg Group through
December 31, 1998."  Dkt. No. 59 Weinberg Decl. ¶ 4.

Plaintiff claims that between 1996 and 2000, the Company and
individual Defendants made improper benefit payments to Myron
Weinberg, Arlyne Weinberg and ten additional participants.  See
Dkt. No. 38 Ex. E.  She claims that in 1994, the Company and Myron
and Arlyne Weinberg entered into an agreement to segregate
$2,488,293 of the Plan's assets into a separate account for the
sole benefit of Myron and Arlyne Weinberg.  Plaintiff maintains

---

[6] To avoid confusion among the various motions before the
Court at this time, the Court will cite to the papers by reference
to their docket numbers.

that creation of this separate account violated the Internal Revenue Code, and therefore it was a breach of the individual Defendants' fiduciary duties to the Plan. She further maintains that the creation of the separate account constituted a "prohibited transaction" under ERISA. Accordingly, Plaintiff claims that the assets in the separate account continued to be Plan assets that were required to be available to provide benefits for all Plan participants, including Plaintiff.

In November 1999, the Plan assets in the separate account were paid to Myron and Arlyne Weinberg. Plaintiff claims these payments were made without first ensuring compliance with the Treasury regulations governing distributions to highly-compensated employees and without application of the relevant Treasury regulation restrictions on lump sum distributions to highly-compensated employees.[7] Plaintiff also contends that at the time the distributions were made, the amount of assets in the Plan, after subtracting the amount of the distributions, did not equal or exceed 110 percent of the Plan's current liabilities, as required by Section 14.04 of the Plan's governing documents. The Company

---

[7] Section 14.04 of the Plan contains restrictions on the benefits payable to any participant who is among the twenty-five most highly compensated employees of the Company at the time distribution is made. These provisions reflect the requirements of 26 C.F.R. § 1.401(a)(4)-5(b) and Rev. Rul. 92-76, 1992-2 C.B. 76. Both Myron Weinberg, as the Chief Executive Officer of the Company until 1997, and Arlyne Weinberg, as the President of an affiliated company that participated in the Plan, were among the twenty-five most highly compensated employees of the Company.

represented in a letter to the Internal Revenue Service ("IRS") dated October 7, 2002 that there were at least ten lump sum distributions made to other highly compensated employees between 1996 and 2000.   Plaintiff claims all of these distributions violated the fiduciary duties of the Company and the individual Defendants, and constituted prohibited transactions under ERISA.

In a staff meeting on February 15, 2002, Matthew Weinberg informed all employees that the Company would no longer make any lump sum distributions of benefits to Plan participants, because, according to Plaintiff, "the Pension Plan had paid out a significant number of benefits to previously retired or terminated participants."

On February 28, 2002, the Company terminated Plaintiff's employment.

On November 27, 2002, Plaintiff filed a claim with the Plan Administrator for a lump sum distribution of her benefits.

By letter dated December 19, 2002, the Company informed Plaintiff that "[t]he Plan is both willing and able to pay Dr. Becker the full amount of her accrued benefit in a lump sum subject to the restrictions described in the immediately following paragraph."  In that paragraph, the Company informed her that, pursuant to Section 14.04 of the Plan, in order to receive a lump sum distribution of her benefits, she must (1) "deposit[] amounts in escrow with a fair market value equal to at least 125% of the

-7-

restricted amount;" (2) "provid[e] a bank letter of credit in an amount equal to 100% of the restricted amount;" or (3) "post[] a bond equal to at least 100% of the restricted amount."

In a March 18, 2003 letter to Matthew Weinberg as Plan Administrator, Plaintiff appealed the denial of her request for an unrestricted lump sum payment of her benefit.  She claimed that the Plan Administrator had erroneously calculated her pension benefit by crediting her with only seven "years of participation" in the Plan, rather than ten years.  Dkt. No. 59, March 18, 2003 Letter.

On May 7, 2003, the Company, acting as Plan Administrator, sent a letter to Plaintiff rejecting her assertion that she should have been credited with ten years of participation.  Dkt. No. 58 Ex. G.  Relying on the language of Plan Amendment No. 3, the letter stated, in relevant part[8]:

> In contrast to the limitations under Section 5.01(f)(7)(ii) of the Plan[9] which are based on <u>years of</u>

---

[8] In her March 18, 2003 letter, Plaintiff also claimed the Plan Administrator imposed unreasonable procedures in determining the benefit amount, and improperly conditioned her receipt of a lump sum benefit on her execution of a security agreement.  The Company's May 7, 2003 letter rejected these claims.

[9] Section 5.01(f)(7)(ii) of the Plan defines the "maximum permissible amount" of a participant's benefit.  Section 5.01(f)(7) provides that the participant shall receive the lesser of 100 percent of the participant's highest average compensation, or the "defined benefit dollar limitation."  Pursuant to Section 5.01(f)(7)(ii), the defined benefit dollar limitation applies when a participant has less than ten years of participation, and reduces the maximum amount of a participant's benefit.  For each year of participation less than ten, the participant's defined benefit
(continued...)

> <u>service</u>, the Plan Administrator has interpreted the limitations of this same subsection which are based on <u>years of participation</u> to require that a participant actually accrue a benefit under the Plan to receive credit for a year of participation.  We note that the Plan Administrator's interpretation is consistent with the IRS' interpretation of years of participation in every other context in which it arises for tax qualification purposes....
>
> As you know, Amendment No. 3 to the Plan which was adopted on December 11, 1998 (and which was signed by Dr. Becker) froze the accrued benefits and all future participation under the Plan as of December 31, 1998, with the result that periods of service performed after December 31, 1998 and compensation received after that date were not taken into account in calculating benefits under the Plan....
>
> Based on the language of Amendment No. 3 requiring that all benefits accrued by Plan participants be frozen as of December 31, 1998, the Plan Administrator has determined that service after December 31, 1998 is not taken into account in determining years of participation for purposes of Section 5.01(f)(7)(ii) of the Plan.

Dkt. No. 38 Ex. G. at 2-3 (emphasis in original).  The letter also attached a separate letter from the Plan's actuary, AON Consulting, explaining the calculation of Plaintiff's benefit amount under Internal Revenue Code Section 415(b).  The letter stated the maximum benefit amount as $130,000, and provided a detailed explanation of the determination of Plaintiff's Social Security Normal Retirement Age.

In December of 2004, Matthew Weinberg personally borrowed $3,000,000.00, which he loaned to the Company to contribute to the

---

[9](...continued)
dollar limitation is reduced by one tenth.

Plan in order to fully fund and ultimately terminate it. Between January 1, 2005 and July 6, 2005, the Company contributed the total amount of $2,276,128.00 to the Plan.

On August 12, 2005 the Company provided Plaintiff with an unrestricted lump sum payment of $484,194.98. On August 18, 2005, Plaintiff cashed the check for her benefit.

On March 21, 2005, the Plan Administrator filed a standard termination notice with the PBGC with respect to the Plan. Am. Compl. ¶ 84. On April 28, 2005, Plaintiff submitted a letter to the PBGC alleging that the Plan Administrator had miscalculated her benefits, and asking the PBGC to suspend termination of the Plan. See Dkt. No. 73 Ex. D. The PBGC had a 60-day period from the time of the termination notice within which to issue any notice of noncompliance; it did not issue any such notice. On November 28, 2005, the Plan Administrator filed a certification with the PBGC certifying that all assets of the Plan had been distributed to Plan participants. The PBGC responded on December 9, 2005, notifying the Plan Administrator that all Plan records must be preserved. See id. On February 6, 2007, the Company and individual Defendants informed the Court that the Plan has been terminated.

**B.   Procedural History**

On August 5, 2003, Plaintiff filed the instant action alleging, inter alia, breaches of fiduciary duty under ERISA and a failure to pay pension benefits. In the original Complaint,

-10-

Plaintiff asserted six separate causes of action against the Company, individual Defendants and the Plan, which she grouped into two general categories: (1) claims on behalf of the Plan against the Company and individual Defendants for the breach of fiduciary duty through their mismanagement of plan assets (Counts 1, 2 and 6); and (2) claims in Plaintiff's own capacity for benefits under the Plan (Counts 3, 4 and 5).

As to these claims, Plaintiff sought a judgment (1) declaring the Company and the individual Defendants jointly and severally liable (including in their capacities as co-fiduciaries) for all losses to the Plan resulting from the alleged fiduciary breaches and prohibited transactions; and (2) enjoining all Defendants from further violating any provision of ERISA or the Plan's governing instruments. Plaintiff also sought the full amount of her benefits, together with the costs of this action, including reasonable attorney's fees, and interest from the date she claims the lump sum distribution of her benefits should have been made.

On July 14, 2005, Plaintiff filed an Amended Complaint with leave of Court. The Amended Complaint joined PBGC as a Defendant and added a Claim for Declaratory Relief (Count 7), seeking a declaration that the Court orders the Company to make Plaintiff or the Plan whole for the additional part of those benefits not paid pursuant to her termination, and that the Court orders PBGC to

conduct an audit of the Plan to ensure that it makes Plaintiff and other participants whole.

On April 7, 2004, the Court denied the motion of the Plan, the Company and individual Defendants to dismiss or, in the alternative, for summary judgment. On July 23, 2004, the Court granted Plaintiff's motion to disqualify counsel for the Plan due to a conflict of interest on the ground that the same counsel represented the Company and individual Defendants. The Court ordered the Plan to retain new, independent counsel. On July 28, 2005, the Court denied the Plan's motion to dismiss and its renewed motion to dismiss the First Amended Complaint.

On March 29, 2005, Plaintiff filed a Motion for Partial Summary Judgment [Dkt. No. 38], which is currently before the Court. The Plan filed an Opposition on April 27, 2005 [Dkt. No. 42], and the Company and individual Defendants filed a separate Opposition on the same date [Dkt. No. 43]. Plaintiff filed a Reply to the Plan's Opposition on May 17, 2005 [Dkt. No. 46], and a separate Reply to the Opposition of the Company and individual Defendants on the same date [Dkt. No. 45].

On September 15, 2005, pursuant to a briefing schedule set during an August 12, 2005 status conference, Plaintiff filed a Motion for Partial Summary Judgment on the Disputed Benefit Amount [Dkt. No. 58], which is currently before the Court. The Plan filed an Opposition on October 14, 2005 [Dkt. No. 62], and the Company

and individual Defendants filed a separate Opposition on the same
date [Dkt. No. 63].   Plaintiff filed her Reply to the Plan on
November 1, 2005 [Dkt. No. 66], and on the same date filed a
separate Reply to the Opposition of the Company and individual
Defendants [Dkt. No. 67].

The Plan filed a Motion for Summary Judgment on Plaintiff's
Claim for Benefits on September 30, 2005 [Dkt. No. 59], which is
currently before the Court.   Plaintiff filed an Opposition on
November 1, 2005 [Dkt. No. 64], and the Plan replied on November
15, 2005 [Dkt. No. 68].

The Company and individual Defendants filed a Motion for
Partial Summary Judgment on September 30, 2005 [Dkt. No. 60], which
is currently before the Court.   Plaintiff opposed on November 1,
2005 [Dkt. No. 65], and the Company and individual Defendants
replied on November 15, 2006 [Dkt. No. 69].

On December 15, 2005, PBGC filed a Motion to Dismiss [Dkt. No.
73], which is currently before the Court.   Plaintiff filed an
Opposition on February 20, 2006 [Dkt. No. 76], and PBGC filed a
Reply on March 13, 2006 [Dkt. No. 79].

## II.   STANDARD OF REVIEW

A motion to dismiss should only be granted "when it appears
beyond doubt that, under any reasonable reading of the complaint,
the plaintiff will be unable to prove any set of facts that would
justify relief."   Hishon v. King & Spaulding, 467 U.S. 69, 73

(1984).  Because such motions "summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, [they] should be treated with the greatest of care."  Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987).  Accordingly, the factual allegations of the Complaint must be presumed true and liberally construed in favor of Plaintiff.  Shear v. Nat'l Rifle Ass'n of Am., 606 F.2d 1251, 1253 (D.C. Cir. 1979).

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56. Material facts are those that "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324.  See Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (nonmoving

party has affirmative duty "to provide evidence that would permit a reasonable jury to find" in its favor); Crenshaw v. Georgetown Univ., 23 F. Supp. 2d 11, 15 (D.D.C. 1998) (noting that "adverse party must do more than simply 'show that there is some metaphysical doubt as to the material facts'" (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986))).

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). See Washington Post Co. v. United States Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

## III. ANALYSIS

### A. Plaintiff's Motion for Summary Judgment as to Counts 3, 4, and 5 of the Amended Complaint Is Denied and the Plan's Motion for Summary Judgment as to Counts 3, 4, 5, and 7 Is Granted Because the Plan's Determination of Plaintiff's Benefit Amount Was Reasonable

Plaintiff seeks summary judgment on, inter alia, Counts 3, 4, and 5 of the Amended Complaint based on the alleged miscalculation of her benefit. The Plan has cross-moved for summary judgment on these Counts, as well as Count 7. As Plaintiff has described them,

-15-

these claims "encompass two distinct, albeit interrelated, issues: (a) an entitlement to an unrestricted distribution of Plaintiff's benefit as expressed in a lump-sum form and (b) an entitlement to a specific amount of such lump-sum benefit." Dkt. No. 58 at 3.

Because Matthew Weinberg and the Company have funded the Plan and the Plan has provided Plaintiff with an unrestricted lump sum distribution, Plaintiff concedes that the only issue currently in dispute is the proper amount of the benefit. Therefore, the issue of her entitlement to a lump sum payment is now moot, and Plaintiff is not entitled to summary judgment on that claim.

Accordingly, Plaintiff "asks the Court for judgment as to the amount of the benefit due to [her] under the terms of the Plan and applicable laws. In the alternative, Plaintiff asks this Court for judgment on the legal question of appropriate Internal Revenue Code ("IRC") Section 415(b) limitations to be applied to the calculation of Plaintiff's lump-sum benefit." Dkt. No. 58 at 3.

Plaintiff argues that the Plan incorrectly calculated her benefit in three ways: (1) it incorrectly applied the version of IRC Section 415(b)(1) in effect in 1999, which set the cap on the annual benefit payable to a beneficiary at $130,000, rather than the amended version in effect in 2002, which set the annual benefit cap at $160,000; (2) it incorrectly applied the IRC Section 415(b)(1) limitation by actuarially adjusting it based on a reduction of Plaintiff's Social Security Retirement Age from age 66

to age 60, rather than applying the correct reduction from the age 62 to age 60; and (3) it credited Plaintiff with seven years of participation in the Plan, rather than the full ten years to which she is entitled.

At no point prior to the September 15, 2005 filing of her Motion for Partial Summary Judgment did Plaintiff raise either of the first two claims, i.e. the annual benefit cap or the Social Security Retirement Age ("Section 415(b) limitations") used in calculating her benefit.

She did not include either of these claims in her original Complaint or her Amended Complaint. Plaintiff's original Complaint failed to raise any allegation regarding any calculation errors in the determination of her benefit. Moreover, her Amended Complaint still fails to plead the Section 415(b) calculation errors, despite her introduction of a claim expressly based on the alleged miscalculation of her "years of participation." Because she cannot raise a new claim in her motion papers, and her Amended Complaint cannot fairly be read to include the Section 415(b) claims, they are not properly before the Court.

Moreover, although she specifically elected to contest the use of seven years of participation in her appeal to the Plan Administrator, Plaintiff failed to contest either of the alleged Section 415(b) calculation errors in any of her appeal correspondence with the Plan Administrator in 2002 and 2003

-17-

regarding her claim for benefits. In her March 18, 2003 appeal letter, Plaintiff noted that there was no information in the Plan Administrator's handwritten notes specifying how the Plan arrived at the benefit limitation amount or the annuity factor that it used to calculate her benefit. Dkt. No. 59 Ex. to Weinberg Decl. at 2. She also requested confirmation that the "Section 415 limitations have been applied consistently to all participants who have received distributions from the Plan." Id. (emphasis in original).

In response to her request for information, the Plan Administrator provided Plaintiff with a detailed letter from the Plan's actuary explaining the calculation of her Social Security Retirement Age (66) and annual benefit cap ($130,000). Dkt. No. 38 Ex. G.  The Plan Administrator's response also expressly invited Plaintiff to present "any additional information relevant to Dr. Becker's claim for benefit recalculation . . . to the Plan Administrator at any time (even if it takes you more than 60 days to submit that information). . . ."  Id. at 6. Significantly, Plaintiff never responded to this letter and never contested either of the calculations used by the Plan Administrator.[10]

---

[10] Plaintiff argues that she was not required to exhaust her administrative remedies because "pursuit of administrative review process would be futile, since in its present Motion Defendant Plan vehemently denies the very arguments that it wants Plaintiff to raise through the administrative review."  Dkt. No. 64 at 7.  As the Plan correctly points out, "[t]he futility exception is . . . quite restricted," and is properly applied "only when resort to administrative remedies is clearly useless" and there is "a
(continued...)

Because Plaintiff failed to raise these claims with the Plan Administrator, despite an express invitation to do so "at any time," she failed to exhaust her administrative remedies.  See Communications Workers, 40 F.3d at 431 ("It is well established that, barring exceptional circumstances, plaintiffs seeking a determination pursuant to ERISA of rights under their pension plans 'must . . . exhaust available administrative remedies under their ERISA-governed plans before they may bring suit in federal court.'") (quoting Springer v. Wal-Mart Assocs. Group Health Plan, 908 F.2d 897, 899 (11th Cir. 1990)).

Accordingly, the only claim for benefits before the Court is that the Plan Administrator was remiss in failing to credit Plaintiff with the years 1999-2002 as years of participation toward her benefit amount.  However, even if she hadn't waived the Section 415(b) claims by failing to raise them in any appeal to the Plan Administrator, her original Complaint, and her Amended Complaint,

---

[10](...continued)
certainty of an adverse decision."  Communications Workers of Am. v. AT&T, 40 F.3d 426, 432-33 (D.C. Cir. 1994) (internal quotations omitted).  As our Court of Appeals explained in Communications Workers, the exhaustion requirement affords the plan administrator the opportunity "to provide a final, fully considered, and reasoned explanation [of its decision]" that will "facilitat[e] meaningful judicial review" of that decision.  40 F.3d at 433.  Moreover, Plaintiff's contention that the Plan's arguments to this Court demonstrate futility was rejected by the court in Communications Workers.  Id. At 433 n.1.  She has presented no other support for her argument that presentation of her Section 415(b) claims to the Plan Administrator would have been futile.

her argument would still fail because the Plan Administrator's decision passes the test of reasonableness, as discussed below.

### 1.    The Court Reviews the Plan Administrator's Decision for Reasonableness

The Plan argues that a reviewing court is required to apply a deferential, "arbitrary and capricious," standard of review to its decision to credit Plaintiff with seven years of participation. Dkt. No. 59 at 5-6. Plaintiff responds that such a deferential standard of review is applicable only where a plan expressly gives the administrator "discretionary or binding authority to determine the amount of benefits due to Plan participants." Dkt. No. 64 at 10.

In <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989), the Supreme Court held that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a <u>de</u> <u>novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Where a plan gives the administrator such discretionary authority, "the standard of review – variously described by the Court as 'arbitrary and capricious' or 'abuse of discretion' review – is plainly deferential." <u>Wagener v. SBC Pension Benefit Plan – Non-Bargained Program</u>, 407 F.3d 395, 402 (D.C. Cir. 2005) (<u>citing</u> <u>Firestone</u>, 489 U.S. at 111-115). Our Court of Appeals "has defined the <u>Firestone</u> deferential standard as one of 'reasonableness.'"

-20-

Id.  (citing Block v. Pitney Bowes, Inc., 952 F.2d 1450, 1452, 1454
(D.C. Cir. 1992)).

In determining whether a plan grants the administrator
discretionary authority, the reviewing court should focus on "the
character of the authority exercised by the administrators under
the plan," not on whether the plan uses the word "discretion" or
any other "magic word."  Block, 952 F.2d at 1453.  Under Block, if
a plan document contains "[e]mpowering language" granting the plan
administrator the authority to interpret the plan's terms, that
"[e]mpowering language" is to be regarded "as conveying
'discretionary or final [interpretative] authority.'"   Id.
(internal citation omitted).  The court in Block found that that
plan granted discretionary authority where "[t]he Plan vest[ed] in
the Administrative Committee power 'to interpret and construe the
Plan, [and] to determine all questions of eligibility and the
status and rights of Participants.'"  Id. at 1452-53.  Empowering
language similar to the plan in Block "almost invariably" has been
found to give the plan administrator such discretionary authority
to interpret the plan's terms, "of the kind that courts check only
for reasonableness."  Id.

In this case, Section 9.04 of the Plan provides:

Power of Plan Administrator: The Plan Administrator shall
administer the Plan in accordance with its terms and
shall have all the powers necessary to carry out the
provisions of the Plan.  The Plan Administrator shall
interpret the Plan and shall determine all questions

arising in the administration and application of the Plan.

Dkt. No. 58 Ex. B at 72.

The statements that the Plan Administrator "shall interpret the Plan" and "shall determine all questions" constitute "[e]mpowering language" at least as broad as the delegation reviewed in <u>Block</u>. 952 F.2d at 1452-53 (<u>citing</u> <u>De Nobel v. Vitro Corp.</u>, 885 F.2d 1180, 1186 (4th Cir. 1989) (administrators have discretionary authority in view of their power under the plan "to determine all benefits and resolve all questions pertaining to the administration, interpretation and application of Plan provisions") (emphasis omitted)). <u>See also</u> <u>Retirement and Sec. Program for Employees of Nat'l Rural Elec. Coop. Ass'n v. Oglethorpe Power Corp. Retirement Income Plan</u>, 712 F. Supp. 223, 226 (D.D.C. 1989) (finding discretionary authority where the plan gave the Committee "the authority to determine all questions arising in connection with the Program, including its interpretation, and may adopt rules for the procedures of the Committee.").[11]

_____

[11] Cases in this Circuit finding that the plan administrator lacked discretionary authority involved pension plans granting much less power to the administrator than the Plan in this case. <u>See</u>, <u>e.g.</u>, <u>Mobley v. Cont'l Cas. Co.</u>, 383 F. Supp. 2d 80, 85-88 (D.D.C. 2005) (rejecting company's argument that the plan's language – "Benefits will be paid monthly immediately after [the company] receive[s] due written proof of loss" – granted it discretionary authority); <u>Alley v. Resolution Trust Corp.</u>, No. 91-0166, 1994 U.S. Dist. LEXIS 9505, at *6-7 (D.D.C. July 1, 1994) (no discretionary authority where the plan's "active verb" was "implement" rather than "construe" or "determine eligibility").

(continued...)

Plaintiff further contends that, whatever the language of Section 9.04, the Court must weigh any conflict of interest in considering whether there is an abuse of discretion.  The Court in Firestone instructed that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)).

Our Court of Appeals has yet to specify the means by which that factor should be weighed.  See Wagener, 407 F.3d at 402-03. In cases involving only a potential but not actual conflict of interest, the district courts in this Circuit have consistently applied the "abuse of discretion," or reasonableness, standard. See Buford v. UNUM Life Ins. Co., 290 F. Supp. 2d 92, 98 (D.D.C. 2003); Hamilton v. AIG Life Insurance Co., 182 F. Supp. 2d 39 (D.D.C. 2002) ("[I]n obeisance to Firestone, the court reviews [the insurer's] decision for abuse of discretion.").  As the court in Hamilton noted, "no court will reverse a plan administrator's decision without some evidence that self-interested behavior affected the administrator's decision."  Id. at 44 n.3.

---

[11](...continued)
    Plaintiff cites three cases from district courts in other Circuits to support her contention that the "broad and unspecific" language of the Plan cannot grant discretionary authority because it is "lacking any 'discretionary' language."  As indicated previously, this Circuit has rejected any requirement that a plan contain the magic word "discretion."

The only evidence Plaintiff offers in support of her conflict of interest argument is that the Plan Administrator "was required to pay benefits out of its own pockets and had an incentive to deny participants' claims." Dkt. No. 64 at 12. Other courts in this Circuit have concluded that such allegations present only potential conflicts of interest, and have applied a deferential standard of review requiring an inquiry into the reasonableness of the plan administrator's decision. See Buford, 290 F. Supp. 2d at 98 (applying deferential standard where plaintiff asserted a conflict of interest because UNUM's "profits were reduced whenever it awards benefits"); Hamilton, 182 F. Supp. 2d at 44 ("Because AIG is a plan fiduciary that also stands to save money through a claim denial, it acts under a potential conflict of interest.").

Plaintiff has offered no evidence that any alleged "self-interested behavior" actually affected the Plan Administrator's decision to deny her benefits. See id. at 44 n.3. Moreover, Plaintiff does not contest the Plan's argument that Matthew Weinberg, as Chief Executive Officer of the Company, in fact acted contrary to his own personal interests in interpreting the impact of the freeze as he did, because his own benefits were also diminished as a result of that determination.

Accordingly, the Court may reject the Plan Administrator's decision only if it is unreasonable.

2.   **The Plan Administrator's Decision Was Reasonable**

"ERISA does not require plan fiduciaries to maximize the benefits of departing employees[;] it only requires them to make a reasonable choice among possible alternatives." Foltz v. U.S. News & World Report, 663 F. Supp. 1494 (D.D.C. 1987), aff'd 865 F.2d 365 (D.C. Cir. 1989).  To assess whether the choice was reasonable, a court must inquire whether the plan administrator "reasonably construe[d] and appl[ied the company's] plan in [plaintiff's] case." Block, 952 F.2d at 1454.  "If there is more than one action that is 'reasonable,' the Court must not overturn a decision found to be reasonable, even if an alternative decision also could have been considered reasonable."  Id. at 1452 (internal quotations omitted).

The Plan argues that the clear and unambiguous purpose and effect of Amendment No. 3 is "to provide that upon their retirement plan participants will receive whatever pension benefit they already had earned under the terms of the Plan as of December 31, 1998." Dkt. No. 59 at 7.  Plaintiff responds that her 1999-2002 employment entitled her to three additional years of participation under the Plan definition, and should therefore be credited in the calculation of her benefits.  She further responds that the IRC Section 415(b) limitations increased after 1998, and she is entitled to have those increased limitations applied to her benefit calculation.

### a.   "Years of Participation"

The Plan Administrator rested its decision to take into account seven of Plaintiff's years of service, i.e. her service through December 31, 1998, based on (1) the language of Amendment No. 3, (2) the consistency of its interpretation with the IRS' interpretation of the term "years of participation" in other contexts, and (3) contemporaneous documents indicating the intent of Amendment No. 3.[12]   The Court concludes that the Plan Administrator's reliance on these considerations, and its consequent determination that Plaintiff's service after December 31, 1998 should not be taken into account for purposes of determining her benefit, was reasonable.

First, the plain language of Amendment No. 3 leaves no room for ambiguity.  The Amendment provides, "all benefits accrued to Plan participants as of [December 31, 1998] will be frozen," and that "no further benefits will accrue under the Plan to participants after [December 31, 1998]."   In calculating Plaintiff's benefits, the Plan Administrator determined that, based on the language of the Amendment, "service after December 31, 1998 is not taken into account in determining years of participation"

_____

[12] Plaintiff concedes that the term "year of participation" is not defined in the IRC. Dkt. No. 58 at 23.  Accordingly, the Plan Administrator could not rely on an IRC definition in its interpretation.

for the purposes of benefits calculation.   Certainly this is a reasonable interpretation of the Amendment.

Second, the Plan Administrator relied on three IRS documents to inform its interpretation of Amendment No. 3.  In its letter to Plaintiff of May 7, 2003, the Company stated that "the Plan Administrator's interpretation is consistent with the IRS interpretation of years of participation in every other context in which it arises for tax qualification purposes."  Dkt. No. 58 Ex. G (citing "IRS Notice 87-21, 1987-1 C.B. 458 (requiring inclusion as a participant under the plan's eligibility provisions for at least one day of the accrual computation period in order to be credited with a year participation for purposes of Code section 415(b)(5)(A)); Reg. § 1.219-2(b)(3) (an individual is not considered to be an active participant in a defined benefit plan where all benefit accruals have ceased); and Reg. § 1.410(b)-3(a) (an employee is treated as benefiting under a defined benefit plan for a plan year if and only if the employee's accrued benefit increases during such year).")[13]  Moreover, as the Plan points out, the IRS has held, in an analogous context involving the application of IRC section 415(b)'s benefit limitation rules, that a "frozen"

---

[13]  Plaintiff attempts to distinguish these notices and regulations on the ground that they apply in different contexts and are therefore inapposite to the calculation of her benefits.  As indicated in the letter, this was precisely the objective of the comparison – to use interpretations of the same concept in different contexts to inform the interpretation that should apply in this context.  This is an entirely reasonable exercise.

plan may not credit a participant with additional "years of participation" in the plan based on services rendered by the participant during the "freeze" period. <u>See</u> IRS Priv. Ltr. Rul. 9842062, 1998 WESTLAW 722539 (Oct. 16, 1998).

Third, contemporaneous documents validate this interpretation of Amendment No. 3. Three days after the Company adopted the Amendment, it issued a notice to all plan participants explaining that the Plan would be frozen. The notice explained the meaning of the Plan freeze, and explained that service after December 31, 1998 would not be included in the calculation of a participant's accrued benefit. Further, the yearly Statement of Plan Benefits provided to Plan participants since 1998 has included the following language: "The amount of your Accrued Benefit depends upon your years of service and the history of your compensation with The Weinberg Group through December 31, 1998."

Based on the plain language of Amendment No. 3, IRS interpretations, and contemporaneous documents indicating the intent of the Amendment, the Court concludes that the Plan Administrator's interpretation of the scope of the freeze was reasonable.[14] The Plan Administrator explained to Plaintiff in its

---

[14] Plaintiff takes the Court through a lengthy and complicated series of steps to show that her years of service after December 31, 1998 should have counted toward her benefit. Even if that interpretation of the Amendment were reasonable, and it is not at all clear to the Court that it is, that is not the question before the Court. Rather, the inquiry is whether the Plan Administrator's
(continued...)

May 7, 2003 letter that, based on its interpretation of Amendment No. 3, it calculated her benefits as though her period of participation in the Plan ceased on December 31, 1998. Because its interpretation of Amendment No. 3 was reasonable, its calculation of Plaintiff's benefit amount based on that interpretation was also reasonable and was not arbitrary and capricious.

### b.   IRC Section 415(b) Limitations

The Plan Administrator also applied two Section 415(b) limitations in effect in 1999 to Plaintiff's benefit calculation. First, Section 415(b)(1) limited the annual benefit payable to a participant to the lesser of $130,000 or 100 percent of the participant's average compensation for her high three years. Second, Section 415(b)(2)(C) reduced the benefit which commences before the age of 66 (the benchmark age). The maximum annual benefit allowed under Section 415(b)(1) was the limitation payable at the age of 66, which was then actuarially reduced if the participant retired prior to that age.

These limitations are among the restrictions the IRC requires of defined benefit plans in order to preserve their tax qualified status. To preserve its tax qualified status, the Plan incorporated these limitations. Section 5.01 of the Plan provides that the annual benefit will not exceed the maximum permissible

---

[14](...continued)
interpretation was reasonable, and thus deserving of deference by the Court. See Block,

amount. That section set the maximum permissible amount at $90,000, and provided for automatic annual increases to that amount to match the cost of living adjustments prescribed by the Secretary of the Treasury. Dkt. No. 58 Ex. B, Plan § 5.01(f)(4). However, the Plan does not incorporate by reference any statutory increases in the Section 415(b) limitations prescribed by Congress.

Between 1999 and 2002, Congress changed these Section 415(b) limitations, raising the benefit cap to $160,000 and lowering the benchmark age to 62. Each of these changes would increase Plaintiff's benefit amount. On September 30, 2003, the Company adopted the Amendment of the Weinberg Group Inc. Pension Trust for the Economic Growth and Tax Relief Reconciliation Act of 2001 (hereinafter "Company's EGTRRA Amendment"). Dkt. No. 58 Ex. G. The Company's EGTRRA Amendment was made effective for years ending after December 31, 2001, and incorporated the new Section 415(b) limitations, i.e. the $160,000 maximum benefit amount and the benchmark age of 62, into the Plan.

Plaintiff first contests the Plan Administrator's decision to apply the 1999 limitations and to treat Amendment No. 3 as a complete freeze, not only as to the accrual of years of participation, but also as to the limitations applicable to participants' benefit calculations.

As discussed above, the Plan Administrator's decision to treat the Amendment as a freezing of all participant benefits as of the

effective date of the Amendment was a reasonable interpretation of the Plan.  It is a reasonable and consistent interpretation of the plain language of Amendment No. 3 itself, as well as contemporaneous notices to participants, that participants would receive no enhancement in their pension benefits as a result of any circumstance or event occurring after December 31, 1998.[15]  The Plan Administrator's application of that interpretation to the Section 415(b) limitation changes was reasonable.[16]

Plaintiff further argues that the Company's EGTRRA Amendment retroactively applied the increased limitations to the benefits of participants in the Plan as of December 31, 2001.  The Plan concedes that the literal terms of the EGTRRA Amendment conflict with Plan Amendment No. 3 to the extent those terms indicate an intent to provide benefit increases to Plan participants based on the adjustments to IRC Section 415(b) limitations.  As the Plan

---

[15]  Plaintiff argues that the Plan Administrator could not reasonably interpret the freeze in this manner because adjustment of Section 415(b) limitations is within the exclusive province of the legislative and executive branches.  While this is certainly true, it is unavailing to Plaintiff.  These limitations set benefit caps, but do not restrict a plan from providing lower benefit amounts or setting lower caps.

[16] Moreover, the Plan Administrator applied this interpretation consistently to the calculations of all participants' benefits. Dkt. No. 38 Ex. G at 3.  Application of the Section 415(b) limitations as of the date of the freeze reduced the benefit payment to four additional Plan participants, including the CEO, Matthew Weinberg.

correctly points out, however, the reconciliation of such conflicting terms is the responsibility of the Plan Administrator.

The Declaration of Matthew Weinberg ("Weinberg Declaration") explains that the Company adopted its EGTRRA Amendment as a ministerial act of tax qualification-related housekeeping.  Dkt. No. 59 Weinberg Decl. ¶ 5.  It purchased this "off-the-shelf" amendment from a so-called "volume submitter."  As the Weinberg Declaration explains, the volume submitter is responsible for "monitor[ing] applicable changes in the constantly-evolving tax laws; prepar[ing] 'off-the-shelf' plan amendments as necessary to ensure that the Plan remains in full compliance with those constantly-evolving tax laws; obtain[ing] Internal Revenue Service ('IRS') pre-approval of these 'off-the-shelf' plan amendments; and provid[ing] these 'off-the-shelf' plan amendments to the Company for signature and submission to the IRS."  Id.  This boilerplate amendment "was not tailored to the Plan's individual circumstances—including, in particular, the circumstance that the Plan was 'frozen.'"  Dkt. No. 59 at 19.

The Weinberg Declaration further explains that the Company's EGTRRA Amendment was not adopted with the purpose of "unfreezing" plan benefits.  To the extent it contains language conflicting with Plan Amendment No. 3's freeze of the Plan, the fact that it was purchased "off-the-shelf" provided a rationale for resolving the conflict in favor of maintaining the freeze.  Dkt. No. 59 Weinberg

-32-

Decl. ¶ 6.   This is a reasonable explanation, as is the Plan
Administrator's reliance on this explanation in applying the
Section 415(b) limitations in effect in 1999 to limit the benefit
amount of several beneficiaries.

For the foregoing reasons, Plaintiff's motions for summary
judgment on Counts 3, 4, and 5 are denied, and the Plan's cross-
motions for summary judgment on Counts 3, 4, 5, and 7 are granted.

**B.   The Motion of the Company and Individual Defendants for
Summary Judgment Is Granted as to Counts 1, 2, and 6 and
Plaintiff's Motion for Summary Judgment Is Denied as to
Counts 2 and 6 Because They Are Moot**

Having determined that Plaintiff has received the full
benefits to which she is entitled, it is necessary to consider the
effect of that determination on her other claims.

In Counts 1, 2 and 6 of the Amended Complaint, Plaintiff
claims that the Company and individual Defendants breached their
fiduciary duties and engaged in prohibited transactions and seeks
recovery on behalf of the Plan under ERISA Section 409(a), 29
U.S.C. § 1109(a).[17]   She claims that the Company and the individual

_____

[17] ERISA Section 409(a) provides:

Any person who is a fiduciary with respect to a plan who
breaches any of the responsibilities, obligations, or
duties imposed upon fiduciaries by this subchapter shall
be personally liable to make good to such plan any losses
to the plan resulting from each such breach, and to
restore to such plan any profits of such fiduciary which
have been made through use of assets of the plan by the
fiduciary, and shall be subject to such other equitable
or remedial relief as the court may deem appropriate,
(continued...)

-33-

Defendants[18] breached their fiduciary duties under ERISA Section 404(a), 29 U.S.C. § 1104(a), by paying benefits to twelve highly compensated employees without complying with relevant IRS restrictions on those payments.  She also claims that those same payments constituted prohibited transactions in violation of the Company's and individual Defendants' fiduciary duties under ERISA Sections 406(a) and (b), 29 U.S.C. § 1106(a) and (b).[19]

The Company and individual Defendants contend that these claims are now moot because any loss to the Plan has been restored and Plaintiff has been paid.  Because Plaintiff purports to bring Counts 1, 2, and 6 on behalf of the Plan, any damages she may be able to establish would be paid to the Plan, not to her directly. Because the Plan is now fully funded, the Company and individual Defendants argue that any loss has been restored and Plaintiff's claims are therefore moot.

"A case is moot if 'events have so transpired that the decision will neither presently affect the parties' rights nor have

---

[17](...continued)
including removal of such fiduciary.

[18] The parties dispute whether the individual Defendants were Plan fiduciaries.  Because the Court concludes that Plaintiff's fiduciary duties claims are moot, it is not necessary to reach this question.

[19] ERISA Section 404(a) imposes a general duty of care upon plan fiduciaries.  ERISA Section 406 prohibits "[t]ransactions between plan and party in interest" and "transactions between plan and fiduciary."  Each of these sections regulates duties of plan fiduciaries.

a more-than-speculative chance of affecting them in the future.'" Pharmachemie B.V. v. Barr Lab., Inc., 276 F.3d 627, 631 (D.C. Cir. 2002) (internal citation omitted).   Where there is no harm redressible by the Court, the claim is moot and must be dismissed. Id.

ERISA authorizes pension plan participants to sue fiduciaries for losses to the plan as a result of breach of their fiduciary duties, including losses resulting from any prohibited transaction. 29 U.S.C. §§ 1109, 1132(a).   A plan beneficiary may bring such a suit on behalf of the plan itself, as Plaintiff has done in this case.   Any recovery under such an action is restored to the plan. 29 U.S.C. § 1109; see also Glanton v. Mackner, 465 F.3d 1123, 1126 (9th Cir. 2006) ("ERISA gives plan beneficiaries nothing [when they sue on behalf of the plan]; any monetary recovery goes to the plans – as would the benefits of any injunctive relief.").   When Plaintiff originally brought this suit, she had standing on behalf of herself and the Plan because she had not yet received her benefit payment.   Since that time, events have transpired, i.e. her payment, that have extinguished her original interest in the outcome of the suit.

Participants in a defined benefit plan are entitled only to their accrued benefit, and have no claim "to any particular asset that composes a part of the plan's general asset pool."   Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 440 (1999).   Because the

Plan's obligation to pay Plaintiff is satisfied, all the relief Plaintiff seeks in Counts 1, 2 and 6 would be paid to, or inure to the benefit of, the Plan.

Where, as here, a beneficiary has received her pension plan benefits, that beneficiary no longer has any personal stake in the outcome of the litigation.[20]  As a result of the Plan's payment of her benefits, Plaintiff's interest in the breach of fiduciary duties and prohibited transactions claims has become moot.[21]  Even if she were to prevail, there is no remedy recoverable by the Plan in which she has an interest.  Accordingly, she no longer has standing to pursue these claims.  Her lack of a stake in the outcome renders them moot.

---

[20] The Supreme Court has ruled that ERISA plan beneficiaries may bring suits on behalf of the plan in a representative capacity. Massachusetts Mutual Life Ins. v. Russell, 473 U.S. 134, 142 n.9 (1985).  However, as the court explained in Glanton, "[w]e have no quarrel with this proposition – so long as plaintiffs otherwise meet the requirements for Article III standing.  ERISA plans are organized in a variety of ways, and no doubt some would give participants a stake in a lawsuit against fiduciaries."  465 F.3d at 1127.

[21] Plaintiff contends that she retains an interest in the fiduciary duty claims because Defendants improperly calculated the amount of her benefit, and she therefore stands to benefit from any recovery by the Plan.  However, the Court has already concluded that she has received the entire amount to which she is entitled.  Moreover, her argument that her claims are not moot because the conduct in this case is capable of repetition fails for the same reason.  She claims that the termination of the Plan will not prevent the harm from recurring because a decision in her favor on these claims will delay or reverse the termination.  Whatever the merits of this argument, it does not affect her lack of a "stake" in these claims.

Plaintiff relies on Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock, 861 F.2d 1406 (9th Cir. 1988) as support for the proposition that her claims are not moot because she may recover "the ill-gotten profits made by Defendants through their misuse of Plan assets."  In Amalgamated Clothing, the plaintiffs, former pension plan participants, had received all the payments they were actuarially due under the terms of the plan.  Because the plan was terminated, any recovery would have been returned to the allegedly breaching fiduciaries.  The plaintiffs therefore requested that the court impose a constructive trust upon the employers' or plan's "ill-gotten profits," to be paid out to the plan participants.  861 F.2d at 1409.  The Ninth Circuit reversed the district court's denial of the constructive trust requires because an identifiable portion of the beneficiaries' pension plans had been improperly taken from them.  Id. at 1419.

The Ninth Circuit recently clarified Amalgamated Clothing in Glanton.  465 F.3d at 1126 n.4.  In Glanton, the court considered whether, under ERISA, prescription drug plan participants had standing to sue their plans' fiduciaries where they would not be entitled to any of the recovery from the suit.  Id. at 1124.  The court was clear that Amalgamated Clothing did not directly address the Article III standing requirement, but rather "authorized a remedy that would inure to the benefit of the plan participants rather than the plan."  Id. at 1126 n.4.  The Ninth Circuit ruled

that <u>Amalgamated Clothing</u> was inapplicable to <u>Glanton</u>, as here, because the plaintiffs "d[id] not seek the imposition of a constructive trust for their own benefit, or any other remedy that would entitle them to any amount recovered in this lawsuit." <u>Id.</u>[22]

Because Counts 1, 2 and 6 of the Amended Complaint are moot, Plaintiff's Motion for Partial Summary Judgment [Dkt. No. 38] is denied as to Counts 2 and 6, and the Motion of the Company and individual Defendants for Partial Summary Judgment [Dkt. No. 60] is granted as to Counts 1, 2 and 6.

### C. PBGC's Motion to Dismiss Count 7 Is Granted Because There Is No Ripe Claim Against PBGC

In Count 7 of the Amended Complaint, Plaintiff seeks declaratory relief against PBGC.[23]  Specifically, Plaintiff seeks:

> A declaration that regardless of the standard termination of the Pension Plan and the upcoming distribution of the Plan assets, this Court, in the event it finds in favor of Plaintiff on the amount of her benefits and such finding affects the benefits of other participants as calculated by Defendant Company, will direct the Pension Benefit Guaranty Corporation to conduct an audit of the Pension Plan to ensure that the Plan makes Plaintiff and other participants whole in accordance with the Court's findings, or, in the absence of cooperation by the Plan

---

[22] Plaintiff further claims that the loss to the Plan includes the profits that could have been made had it remained fully funded at all times.  She has also requested injunctive relief, including an injunction against the Company and individual Defendants preventing them from holding certain fiduciary positions.  Although ERISA may authorize such relief, this does not save Plaintiff's claims because she has no personal stake in the remedy.

[23] Under Title IV of ERISA, PBGC is a federal agency that administers the pension termination insurance program.  29 U.S.C. § 1302; <u>see</u> <u>also</u> <u>Nachman Corp. v. PBGC</u>, 446 U.S. 359, 361 (1980).

Administrator (Defendant Company), will direct the PBGC
to nullify the termination of the Pension Plan.

Am. Compl. ¶ 90(3).

PBGC moves to dismiss this Count pursuant to Federal Rule of
Civil Procedure 12(b)(1) and 12(b)(6).  Dkt. No. 73 at 1.  PBGC
argues that because Plaintiff has not alleged PBGC caused her any
injury, or that she has any claim against PBGC for which relief can
be granted, the Court lacks jurisdiction over her claim.  PBGC
further argues that its decision to exercise its enforcement
authority in this area is committed by law to the agency's
discretion.

Plaintiff responds that she is not asking the Court "to direct
PBGC to nullify the Plan's termination or conduct the Plan's
audit."  Rather, she seeks "a declaration that the Court will issue
such a directive after (and if) the Court rules in Plaintiff's
favor."  If the Court rules for Plaintiff on her claims for
benefits, she argues, "it is the duty of PBGC to ensure that the
Plan administrator immediately amends its act in accordance with
the Court's ruling...."  Dkt. No. 76 at 9.

Three independent rationales support dismissal of this claim.
First, Plaintiff clearly conditions the requested relief on a
finding in her favor.  She seeks the declaration "in the event [the
Court] finds in favor of Plaintiff on the amount of her benefits."
Am. Compl. ¶ 90(3).  The Court has not found in her favor on the
amount of her benefits.

-39-

Second, even if the Court had found in Plaintiff's favor, the Court lacks jurisdiction to review her claim against PBGC because its decision to exercise its enforcement authority in this area is committed by law to the agency's discretion by law.  5 U.S.C. § 701(a)(2); see Heckler v. Chaney, 470 U.S. 821 (1985).  Under Chaney, an agency's decision not to exercise its enforcement authority, or to exercise it in a particular way, is committed to its absolute discretion and is not subject to judicial review. Balt. Gas & Elec. Co. v. FERC, 252 F.3d 456, 459 (D.C. Cir. 2001) (citing Chaney, 470 U.S. at 831).

In Webster v. Doe, 486 U.S. 592, 600 (1988), the Supreme Court found that the agency's decision was unreviewable where the statutory language authorized termination of an employee if the agency director "deem[ed] termination necessary or advisable in the interests of the United States."  The Court found that such language "fairly exudes deference" to the agency, and "foreclose[s] the application of any meaningful judicial standard of review." Id.  When the governing statute provides the agency with such a subjective standard, i.e., "whether the agency thinks that a condition has been met," rather than an objective standard, i.e. "whether the condition in fact has been met," there is "no law to apply" and the agency's decision is unreviewable.  Drake v. FAA, 291 F.3d 59, 72 (D.C. Cir. 2002).

The statute applicable in this case provides:

> Within 60 days after receipt of the notice under subparagraph (A), the [PBGC] shall issue a notice of noncompliance to the plan administrator if-
>
> > (I) <u>it determines</u>, based on the notice sent under paragraph (2)(A) of subsection (b), that there is reason to believe that the plan is not sufficient for benefit liabilities,
> >
> > (II) <u>it otherwise determines</u>, on the basis of information provided by affected parties or otherwise obtained by the corporation, that there is reason to believe that the plan is not sufficient for benefit liabilities; or
> >
> > (III) <u>it determines</u> that any other requirement of subparagraph (A) or (B) of this paragraph or of subsection (a)(2) has not been met, unless it further determines that the issuance of such notice would be inconsistent with the interests of participants and beneficiaries.

29 U.S.C. § 1341(b)(2)(C)(I) (emphasis added).   PBGC's obligation to issue a notice of noncompliance is triggered only "if it determines" one of the several listed factors applies.   This language provides the PBGC with a subjective standard whose application cannot be reviewed by this Court.

The PBGC's decision not to audit or issue a notice of noncompliance is analogous the exercise of "prosecutorial discretion" discussed in <u>Chaney</u>.   Its discretion to not act in this case is a "single-shot nonenforcement decision,"[24] i.e., "an agency's decision to decline enforcement in the context of an

---

[24] Plaintiff does not dispute that the actions she describes in Count 7 constitute enforcement actions.

individual case," and is unreviewable.   Crowley Caribbean
Transport, Inc. v. Peña, 37 F.3d 671, 676 (D.C. Cir. 1994).

Third, Plaintiff has failed to demonstrate that there is an
actual controversy at this time warranting the declaratory relief
she requests in Count 7.  "Under the Declaratory Judgment Act, 28
U.S.C. § 2201(a), a federal court may exercise jurisdiction over a
declaratory judgment only when there is an actual controversy
between the parties."  Citizen Electronic Company, LTD v. Osram,
377 F. Supp. 2d 149, 152 (D.D.C. 2005) (citing EMC Corp. v. Norand
Group, 89 F.3d 807, 810 (Fed. Cir. 1996)).  A plaintiff must
demonstrate that "there is a substantial controversy, between
parties having adverse legal interests, of sufficient immediacy and
reality to warrant the issuance of a declaratory judgment."  Atlas
Air, Inc. v. Air Line Pilots Ass'n, Int'l, 69 F. Supp. 2d 155, 162
(D.D.C. 1999) (citing Maryland Casualty Co. v. Pacific Coal & Co.,
312 U.S. 270, 273 (1941)).  This requirement is the same as the
"case or controversy" requirement for justiciability under Article
III of the United States Constitution.  Aetna Life Ins. Co. v.
Haworth, 300 U.S. 227, 239-41 (1937); Federal Express Corp. v. Air
Line Pilots Ass'n, 67 F.3d 961 (D.C. Cir. 1995).  Absent an "actual
controversy," the federal courts are powerless to issue a
declaratory judgment.

There is no "actual controversy" between Plaintiff and PBGC.
Plaintiff's claim itself requests that this Court, "in the event it

<u>finds</u> in favor of Plaintiff on the amount of her benefits and such finding affects the benefits of other participants as calculated by Defendant Company, will direct the Pension Benefit Guaranty Corporation...." Am. Compl. ¶ 90(3) (emphasis added). However, the Court has rejected Plaintiff's claims.

Plaintiff argues further that, in Count 7, she "asked the Court to declare that this Court has <u>the</u> <u>power</u> to direct PBGC" to nullify the Plan's termination or conduct the Plan's audit. Dkt. No. 76 at 6 (emphasis in original). Although Plaintiff attempts to remedy the failure to allege an actual controversy by alleging prior impropriety in PBGC's failure to issue a notice of noncompliance,[25] she does not seek relief for that action. She seeks only to ensure that PBGC will fulfill its duty if the Court rules in her favor. As if to emphasize the point, she states, "Plaintiff asks the Court for declaratory relief stating that it shall direct PBGC to make an enforcement decision only <u>after</u> the Court rules in favor of Plaintiff. Plaintiff does not ask this Court for any sanctions against PBGC for its <u>past</u> refusal to enforce." Dkt. No. 76 at 13 (emphasis in original). It is clear that the Court lacks jurisdiction to award such relief.

---

[25] Plaintiff argues that Defendant PBGC "surely has contributed to [her injury] by failing to prevent the injury from occurring in the first place.... By not taking any action with respect to the Plan, PBGC failed to prevent the injury to Plaintiff from taking place." Dkt. No. 76 at 8. This argument raises a separate claim not pled in the Amended Complaint.

For the foregoing reasons, Defendant PBGC's Motion to Dismiss [Dkt. No. 73] is granted.

### D.   Plaintiff Must File an Application for Attorney's Fees and Costs No Later Than April 2, 2007

Plaintiff seeks an award of attorney's fees and costs in her Motion for Partial Summary Judgment and her Motion for Partial Summary Judgment on the Disputed Benefit Amount.  Dkt. No. 38, Dkt. No. 58.

Plaintiff may be entitled to such an award.  ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The statute is silent as to whether a party must be a "prevailing party" in order to obtain an award of attorney's fees.[26]

The parties should have a full opportunity to brief this issue as well as the factors different courts have taken into account in determining attorney's fees awards.   See Eddy v. Colonial Life Insurance Co. of America, 59 F.3d 201 (D.C. Cir. 1995); Adams v. Bowater Inc., 313 F.3d 611, 615 (1st Cir. 2002) ("Whether the plaintiffs can recover attorney's fees does not necessarily depend on whether a formal judgment has been entered [in their favor].

---

[26] In Buckhannon Board & Home Care, Inc. v. West Virginia Dept. of Health & Human Resources, 532 U.S. 598 (2001), the plaintiffs sued under the Americans with Disabilities Act and the Fair Housing Amendments Act, both of which expressly limit awards of attorney's fees to the "prevailing party."   42 U.S.C. §§ 3613(c)(2), 12205. The Supreme Court's rejection of the "catalyst" theory in that case, which relied on the "prevailing party" language, does not control the ERISA fee-shifting provision.

The Supreme Court [referring to <u>Buckhannon</u>] did require a judgment under one statute, but the ERISA statute is differently phrased and conceivably the result could be different.") (internal citation omitted); <u>Franklin v. H.O. Wolding, Inc.</u>, No. 04-0367, 2004 U.S. Dist. LEXIS 26592, at *24-25 (S.D. Ind. Dec. 8, 2004) (observing that <u>Buckhannon</u> left open the question of whether it rejected the "catalyst" theory in cases involving fee shifting statutes that do not contain the "prevailing party" requirement, but declining to decide question). Accordingly, Plaintiff shall submit to the Court no later than April 1, 2007 a detailed application for attorney's fees and costs.[27]

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment [Dkt. No. 38] is **denied**, Plaintiff's Motion for Partial Summary Judgment on the Disputed Benefit Amount [Dkt. No. 58] is **denied**, Defendant's (Plan) Motion for Summary Judgment [Dkt. No. 59] is **granted**, Defendants' (Company and individual Defendants) Motion for Partial Summary Judgment [Dkt. No. 60] is **granted**, and Defendant's (PBGC) Motion to Dismiss [Dkt. No. 73] is **granted**. Accordingly, no live claims remain and the case will be **dismissed**.

---

[27] Plaintiff is warned, in advance, not to submit any unreasonable fee requests.

An Order will issue with this Memorandum Opinion.


February 13,2007                          /s/
                                    _____
                                    Gladys Kessler
                                    United States District Judge