UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KAREN BECKER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Case No. 03-1668 (GK) |
| | : | |
| THE WEINBERG GROUP, INC., | : | |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

This is a complex case brought under the Employment Retirement Insurance Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiff, a former employee of The Weinberg Group, Inc., sued the Defendants[1] for breaches of fiduciary duty and a failure to pay pension benefits. After extensive briefing, the Court decided several dispositive motions which brought the case to conclusion.

At this time, three matters are pending before the Court: (1) Plaintiff's Application for Attorneys' Fees [Dkt. #21], which relates to her successful opposition to the Defendants' Motion to Dismiss [Dkt. #3]; (2) Plaintiff's Application for Attorneys' Fees [Dkt. #87], which relates to the Court's Memorandum Opinion of February 13, 2007 [Dkt. #86], denying Plaintiff's Motion for Partial Summary Judgment [Dkt. #38] and Plaintiff's Motion for Partial Summary Judgment on the Disputed Benefit Amount [Dkt. #58], and granting Defendant Weinberg Group Pension Trust's

---

[1] The Defendants in this case are The Weinberg Group, Inc. Pension Trust, Myron Weinberg, Arlyne Weinberg, Matthew Weinberg, The Weinberg Group, Inc. and the Pension Benefit Guaranty Corporation ("PBGC"). For ease of reading, the Court will be referring to "the Defendants," but that reference does not include the Defendant Pension Benefit Guaranty Corporation.

Motion for Summary Judgment on Plaintiff's Claim for Benefits [Dkt. #59], Defendants' (The Weinberg Group, Inc. and Individual Defendants) Motion for Partial Summary Judgment [Dkt. #60], and Defendant Pension Benefit Guaranty Corp.'s Motion to Dismiss [Dkt. #73]; and (3) Defendants' Petition for Award of Attorneys' Fees [Dkt. #88], which also relates to the Court's Memorandum Opinion of February 13, 2007. Thus, all pending requests concern the issue of attorneys' fees.

I.   **BACKGROUND**[2]

The Company provides testing and research services primarily to businesses seeking regulatory approval for their products or operations. It also helps customers improve manufacturing processes and defend their products in court and the media. It has approximately 75 employees. Myron Weinberg was the Chief Executive Officer of the Company until 1997. His son, Michael Weinberg, succeeded him as ECO. Arlyne Weinberg was the President of an affiliated company that also participated in the Company's benefit plan ("the Plan").

Plaintiff was employed with the Company from September 1, 1990 until February 28, 2002. She was 47 years old when she left. According to her Affidavit, her income from employment with the Company ranged from $352,297.52 to $852,145.10 between 1996 and 2001. From 1998 until 2002, Plaintiff was employed as a director and officer of the Company. As a Company employee, she was a participant in the Company's Plan. The Company served as the Administrator of the Plan.

The Plan is a defined benefit plan. Under a defined benefit plan, an employee is entitled to a fixed payment upon retirement, the amount of which is determined based on a formula

---

[2]   Much of the material in this section is taken from the Memorandum Opinion filed February 13, 2007 [Dkt. #86] and the Memorandum Opinion filed April 7, 2004 [Dkt. #20].

incorporating factors such as salary history and duration of employment.[3] See 29 U.S.C. § 1002(35). Because the payments are fixed, beneficiaries are not entitled to any plan assets exceeding the amount of their benefits.

Under the terms of the Company's Plan, each participant is entitled, upon retirement or termination, to vested benefits that accrue based on compensation and years of service, as well as certain other factors not relevant to these proceedings. The Plan documents provide several options for distribution of benefits to participants, including a lump sum distribution upon termination of employment with the Company.

On December 11, 1998, the Company adopted Plan Amendment No. 3 ("Amendment No. 3"), which states:

> BE IT RESOLVED that effective as of December 31, 1998, all benefits accrued to Plan participants as of such date will be frozen and no further benefits will accrue under the Plan to participants after such date.

Dkt. #58 Ex. D. On December 19, 1998, the Company issued a notice to all Plan participants stating:

> This notice is to inform you that benefits attributable to the Weinberg Consulting Group, Inc. Pension Trust will be frozen effective December 31, 1998. This means that services performed only through December 31, 1998 will be included in the calculation of your accrued benefit. Thereafter, no further benefits will be earned under the Pension Trust, and hours of service performed and compensation earned after December 31, 1998, will not be included in the calculation of your accrued benefit.

Dkt. #58 Ex. F.

---

[3] In a defined contribution plan, by contrast, employees (and their employers) may contribute to the funding of their benefit, typically by contributing a fixed percentage of their salaries.

Each year since 1998, the Statement of Plan Benefits provided to Plan participants reiterated that Plan benefits were frozen as of December 31, 1998, and stated, with minor variations, that "[t]he amount of [a participant's] Accrued Benefit depends upon [the participant's] years of service and the history of [the participant's] compensation with The Weinberg Group through December 31, 1998." Dkt. #59 Weinberg Decl. ¶ 4.

Plaintiff claimed that between 1996 and 2000, the Company and individual Defendants made improper benefit payments to Myron Weinberg, Arlyne Weinberg, and ten other Plan participants. See Dkt. #38 Ex. E. She claimed that in 1994, the Company and Myron and Arlyne Weinberg entered into an agreement to segregate $2,488,293 of the Plan's assets into a separate account for the sole benefit of Myron and Arlyne Weinberg. Plaintiff argued that creation of this separate account violated the Internal Revenue Code, and therefore was a breach of the individual Defendants' fiduciary duties to the Plan. She further maintained that the creation of the separate account constituted a "prohibited transaction" under ERISA. Accordingly, Plaintiff argued that the assets in the separate account continued to be Plan assets that were required to be available to provide benefits for all Plan participants, including Plaintiff herself.

In November 1999, the Plan assets in the separate account were paid to Myron and Arlyne Weinberg. Plaintiff claimed these payments were made without first ensuring compliance with the Treasury regulations governing distributions to highly-compensated employees and without application of the relevant Treasury regulation restrictions on lump sum distributions to highly-compensated employees.[4] Plaintiff also contended that at the time the distributions were made, the

---

[4] Section 14.04 of the Plan contained restrictions on the benefits payable to any participant who is among the twenty-five most highly compensated employees of the Company at
(continued...)

-4-

amount of assets in the Plan, after subtracting the amount of the distributions, did not equal or exceed 110 percent of the Plan's current liabilities, as required by Section 14.04 of the Plan's governing documents. The Company represented in a letter to the Internal Revenue Service ("IRS"), dated October 7, 2002, that there were at least ten lump sum distributions made to other highly compensated employees between 1996 and 2000. Plaintiff argued that all of these distributions violated the fiduciary duties of the Company and the individual Defendants, and constituted prohibited transactions under ERISA.

In a staff meeting on February 15, 2002, Matthew Weinberg informed all employees that the Company would no longer make any lump sum distributions of benefits to Plan participants, because, according to Plaintiff, "the Pension Plan had paid out a significant number of benefits to previously retired or terminated participants."

On February 28, 2002, the Company terminated Plaintiff's employment.

On November 27, 2002, Plaintiff filed a claim with the Plan Administrator for a lump sum distribution of her benefits.

By letter dated December 19, 2002, the Company informed Plaintiff that "[t]he Plan is both willing and able to pay Dr. Becker the full amount of her accrued benefit in a lump sum *subject to the restrictions described* in the immediately following paragraph" (emphasis added). In that paragraph, the Company informed her that, pursuant to Section 14.04 of the Plan, in order to receive

---

[4](...continued)
the time distribution is made. These provisions reflect the requirements of 26 C.F.R. § 1.401(a)(4)-5(b) and Rev. Rul. 92-76, 1992-2 C.B. 76. Both Myron Weinberg, as the Chief Executive Officer of the Company until 1997, and Arlyne Weinberg, as the President of an affiliated company that participated in the Plan, were among the twenty-five most highly compensated employees of the Company.

a lump sum distribution of her benefits, she must (1) "deposit[] amounts in escrow with a fair market value equal to at least 125% of the restricted amount;" (2) "provid[e] a bank letter of credit in an amount equal to 100% of the restricted amount;" or (3) "post[] a bond equal to at least 100% of the restricted amount."

In a March 18, 2003 letter to Matthew Weinberg as Plan Administrator, Plaintiff appealed the denial of her request for an unrestricted lump sum payment of her benefit. In addition, she claimed that the Plan Administrator had erroneously calculated her pension benefit by crediting her with only seven "years of participation" in the Plan, rather than ten years. Dkt. #59, March 18, 2003 Letter.

On May 7, 2003, the Company, acting as Plan Administrator, sent a letter to Plaintiff with a detailed explanation of why her assertion that she should have been credited with ten years of participation was rejected. Dkt. #58 Ex. G.

In December of 2004, Matthew Weinberg personally borrowed $3,000,000.00, which he loaned to the Company to contribute to the Plan in order to fully fund and ultimately terminate it. Between January 1, 2005 and July 6, 2005, the Company contributed the total amount of $2,276,128.00 to the Plan.

On August 12, 2005, the Company provided Plaintiff with an unrestricted lump sum payment of $484,194.98. On August 18, 2005, Plaintiff cashed the check for her benefit.

On March 21, 2005, the Plan Administrator filed a standard termination notice with the PBGC with respect to the Plan. Am. Compl. ¶ 84. On April 28, 2005, Plaintiff submitted a letter to the PBGC alleging that the Plan Administrator had miscalculated her benefits, and asking the PBGC to suspend termination of the Plan. See Dkt. #73 Ex. D. The PBGC had a 60-day period

from the time of the termination notice within which to issue any notice of noncompliance; it did not issue any such notice. On November 28, 2005, the Plan Administrator filed a certification with the PBGC certifying that all assets of the Plan had been distributed to Plan participants. The PBGC responded on December 9, 2005, notifying the Plan Administrator that all Plan records must be preserved. See id. On February 6, 2007, the Company and individual Defendants informed the Court that the Plan had been terminated.

## II.     PLAINTIFF'S REQUEST FOR ATTORNEYS' FEES UNDER THE PRE-EXISTING SETTLEMENT AGREEMENT BETWEEN THE PARTIES

On September 3, 2003, Defendants filed a Motion to Dismiss the Complaint [Dkt. #3], in which they argued that Plaintiff's cause of action was foreclosed by a pre-existing Settlement Agreement between the parties.

On September 30, 2003, Defendants filed a Motion for Attorneys' Fees and Costs pursuant to Fed. R. Civ. P. 11 [Dkt. #8], and relied on the same arguments contained in their earlier Motion to Dismiss, namely, that Plaintiff's claims had been waived in the pre-existing Settlement Agreement between the parties. Defendants maintained that the lawsuit was frivolous and undertaken for an improper purpose, and therefore subject to sanctions under Rule 11. On November 4, 2003, the Rule 11 Motion was denied without prejudice by Minute Order.

On April 7, 2004, after extensive briefing, the Motion to Dismiss was denied [Dkt. #20]. In its Memorandum Opinion, the Court ruled that Plaintiff had not, under the parties' Settlement Agreement, waived her right to bring a claim on behalf of the Plan itself and its beneficiaries, nor had she waived her right to bring a claim on her own behalf for benefits under the Plan. Finally, Defendants' argument that Plaintiff was not entitled to an unrestricted lump sum distribution of

benefits because such distribution would violate certain Federal regulations, as well as the terms of the Pension Trust documents, was also denied as premature.

Section 18 of the Settlement Agreement provides that, in the event the Court is called upon to enforce or interpret the terms or scope of such Agreement, the prevailing party is entitled to reasonable attorneys' fees, expenses, expert witness fees, and costs.  There is no question that Plaintiff was the prevailing party with regard to Defendants' Motion to Dismiss, and that litigation of that Motion required interpretation of the terms and scope of the Settlement Agreement.  The Court so ruled in its Memorandum Opinion of April 7, 2004.  Plaintiff's Application for Attorneys' Fees, filed April 27, 2004 [Dkt. #21], was filed in response to the Court's Order that accompanied the April 7, 2004 Memorandum Opinion, requiring Plaintiff to submit a detailed request for all attorneys' fees and costs incurred in bringing this suit.  Plaintiff's Application requested a total of $52,293.78, plus attorneys' fees and costs associated with the Application and the collection of those monies.  Plaintiff ultimately indicated that the monies due her were $56,008.28.  See Pl.'s Reply in Support of App. for Attorneys' Fees.

Defendants object to Plaintiff's inclusion in her Application of fees for the legal work done on her behalf in opposing Defendants' 2003 Rule 11 Motion, as well as Defendants' Motion to Dismiss.  As noted earlier, Defendants raised the same substantive arguments in filing their Rule 11 Motion as they raised in their Motion to Dismiss.  Consequently, Plaintiff is entitled to be compensated for her fees involved in opposing the Rule 11 Motion, as well as the Motion to Dismiss.

In their Opposition to Plaintiff's Application for Attorneys' Fees, Defendants also argue that Plaintiff should not have included fees relating generally to the prosecution of her lawsuit. Section 18 contains no such limiting language.

Section 18 of the Settlement Agreement requires the fees awarded to be "reasonable." In reviewing the entire Application, however, the Court does find that the total amount sought of $56,008.28 is unreasonably high. Some of the hours spent on particular tasks were excessive, and some duplicative work was performed. The Court concludes that awarding 85 percent of the requested fees is "reasonable" under § 18 of the Settlement Agreement, and therefore Plaintiff is awarded $47,600 for her Application for Attorneys' Fees [Dkt. #21].

### III. PLAINTIFF'S REQUEST FOR ATTORNEYS' FEES UNDER ERISA

At the conclusion of this law suit, Plaintiff filed an Application for Attorneys' Fees requesting the sum of $316,787.22 [Dkt. #87]. It would appear that Plaintiff has included in her sum of $316,787.22 the $56,008.28 she requested in her first Application for Attorneys' Fees [Dkt. #21]. Taking that into consideration, Plaintiff's request is for $260,778.94. On the same date, Defendants also filed a Petition for Attorneys' Fees, requesting a total amount of $223,749.16.

Both parties base their requests on 29 U.S.C. § 1132(g)(1) of ERISA, which provides that under ERISA, "the Court in its discretion may allow a reasonable attorneys' fees and costs of action to either party." 29 U.S.C. § 1132(g)(1). No guidance is provided in either the statute or the legislative history as to how that discretion should be exercised. In <u>Eddy v. Colonial Life Ins. Co. of Am.</u>, 59 F.3d 201 (D.C. Cir. 1995), our Court of Appeals provided that guidance.

In that Opinion, the Court of Appeals rejected the standard for awarding attorneys' fees in civil rights cases, set forth in <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 446 (1983), which established a

presumption that attorneys' fees should be awarded to a prevailing party absent exceptional circumstances. Instead, our Court of Appeals adopted the "more exacting" standard set forth in Hummell v. S.E. Rykoff & Co., 634 F.2d 446 (9th Cir. 1980), which requires consideration of five factors relating to attorneys' fees without any presumption that such fees should ordinarily be awarded to the prevailing party.[5] Eddy, 59 F.3d at 205-06. The five Hummell factors, as articulated by this Circuit in Grand Union Co. v. Food Employers Labor Relations Ass'n, 808 F.2d 66, 71 (D.C. Cir. 1987), are:

> (1)   the losing party's culpability or bad faith;
>
> (2)   the losing party's ability to satisfy a fee award;
>
> (3)   the deterrent effect of such an award;
>
> (4)   the value of the victory to plan participants and beneficiaries, and the significance of the legal issue involved; and
>
> (5)   the relative merits of the parties' positions.

808 F.2d at 72 (citations omitted).

---

[5]   The Court of Appeals summarized its lengthy discussion considering whether there is an analogy between the awarding of attorneys' fees under the civil rights statutes and the awarding of fees under ERISA:

> We join those circuits which have concluded that the special reasons for adopting a fee-shifting presumption in civil rights actions do not warrant adopting the presumption in ERISA cases. Neither ERISA's language nor its legislative history imply the presumption, and fee-shifting is less necessary as an incentive in ERISA, not because ERISA protects unimportant interests, but because the interests it protects are monetary, rather than dignitary.

Eddy, 59 F.3d at 205.

In adopting the Hummell approach, the Court of Appeals emphasized that it seeks "to focus decision-making on the underlying statutory purpose while affording appropriate leeway for the district court's case-by-case determinations." Eddy, 59 F.3d at 211. In emphasizing that the statutory purpose must be a constant guide, the Court of Appeals noted that ERISA explicitly states its purpose as follows: "to protect interstate commerce, the Federal taxing power, and the interests of the participants in private pension plans and their beneficiaries." Id. at 201, 207 (quoting 29 U.S.C. § 1001(c)) (emphasis in original). Finally the Court of Appeals pointed out that the five Hummell factors are neither exclusive nor quantitative and therefore afford leeway to the District Courts to evaluate and augment determinations on a case-by-case basis. Id. at 206.[6]

## III.   APPLICATION OF THE HUMMELL FACTORS

### A.   Whether to Grant an Award

The awarding of attorneys' fees in this case presents difficult issues. This litigation has been extremely contentious. The pleadings in the case have often been sarcastic, vitriolic, and condescending. Counsel have often impugned, in very personal terms, the motives of the opposing party. Moreover, the positions of the parties have shifted significantly during the course of the litigation.

---

[6]   The Court is well aware of the Supreme Court's ruling in Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 602-05 (2001), that, in order to qualify as a "prevailing party," one must secure either a judgment on the merits or a Court-ordered consent decree. In doing so, the Supreme Court rejected "the 'catalyst theory' which posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." 532 U.S. at 601. Buckhannon was decided under the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601, *et seq*. and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. Neither of these statutes speak to the award of attorneys' fees under ERISA. Consequently, Buckhannon is not applicable to this case.

First, Hummell directs us to consider the losing party's culpability or bad faith. In this case, that is easier said than done. Before the litigation began, Defendants refused to give Plaintiff the vested benefits to which she was entitled. Instead, Defendants insisted upon conditioning payment of her lump sum benefit (1) upon her depositing amounts in escrow with a fair market value equal to at least 125 percent of her benefit, (2) upon her providing a bank letter of credit equal to 100 percent of her benefit, or (3) upon her posting a bond equal to at least 100 percent of her benefit. Such restrictions were illegal and would have imposed substantial costs upon Plaintiff, even if she were able to satisfy them. She was entitled to a free and clear lump sum payment of $484,194.98, without any conditions or restrictions whatsoever.[7]

After litigation of several substantial motions, Defendants changed their approach to the litigation. On August 12, 2005, Defendants finally paid Dr. Becker what she was entitled to, namely, her lump sum benefit without any restrictions or conditions. At that point, Plaintiff did adopt a combative stand and refused to settle the litigation. Consequently, by the time dispositive summary judgment motions were finally litigated, resulting in the Memorandum Opinion of February 13, 2007, many of Plaintiff's claims had either become moot or no longer were viable. Thus, she filed her lawsuit in good faith, she prevailed on the claims as originally formulated in the Complaint, but lost on a number of summary judgment issues at the end of the lawsuit because Defendants had taken actions which mooted her original claims.

---

[7] It should go without saying that the fact that Dr. Becker was a highly paid employee who had a right to a very substantial lump sum benefit payment upon her retirement should not, in any way, be held against her. Understandably, she was paid such a high salary because Defendants thought she was worth it.

Plaintiff brought this litigation not only on behalf of herself, but on behalf of other beneficiaries of the Plan. From the very beginning, Plaintiff argued that the Plan was under-funded because it had made improper payments to members of the Weinberg family and 10 other Plan participants. In particular, she argued that the Company segregated into a separate account $2,480,293 for the sole benefit of Myron and Arlyne Weinberg, in violation of ERISA and the Internal Revenue Code. According to Plaintiff, it was this depletion of the Plan's assets by almost $2.5 million, which caused the under-funding that made it impossible to pay Plan beneficiaries the lump sum payments to which they were entitled.

While this issue regarding the alleged under-funding of the Plan was never fully litigated, it is noteworthy that in December of 2004, Matthew Weinberg personally borrowed $3 million, which he loaned to the Company to contribute to the Plan in order to fully fund the Plan and ultimately terminate it. The Company contributed $2,276,128 to the Plan in the first six months of 2005. Despite having filed her lawsuit in 2003, Plaintiff did not receive her unrestricted lump sum payment of $484,194.98 until August 12, 2005 -- almost 21 months after she requested it. Thanks to Plaintiff's efforts in this lawsuit, the Plan did become fully funded, so as to ensure that all beneficiaries would be able to receive the maximum lump sum benefits that they were entitled to before its termination.

It is because of this complex scenario that it is very hard to clearly identify a "winning" and "losing" party. Plaintiff, Dr. Becker, "won" in the two years after filing her lawsuit, in that she received the unrestricted lump sum payment to which she was entitled. On the other hand, Defendants "won" in that they prevailed on their final Motions for Partial Summary Judgment and for Summary Judgment and defeated Plaintiff's Motion for Partial Summary Judgment and

Plaintiff's Motion for Partial Summary Judgment on the Disputed Benefit Amount. These Motions were decided in the Memorandum Opinion of February 13, 2007. As noted earlier, that Opinion held that a number of issues had become moot by virtue of Defendants' full funding and ultimate termination of the Plan and upheld the reasonableness of the Plan Administrator's calculations of the precise benefit amount to which Plaintiff was entitled.

If, however, culpability or bad faith must be assigned, it must be assigned to Defendants. From November 27, 2002, when Plaintiff first made a request for the payment of her lump sum benefit, until August 12, 2005, when she was finally paid the entire amount of $484,194.98 -- without any restrictions -- to which she was entitled, Defendants refused to pay either Plaintiff or other Plan beneficiaries the unrestricted lump sum benefits they had earned. Moreover, in their own Petition for Attorneys' Fees, Defendants are disingenuous to say the least when they argue that "eight months before Plaintiff filed her lawsuit, The Weinberg Group offered Plaintiff the full amount of her accrued benefit under the Pension Trust." Defs.' Pet. for Award of Attorneys' Fees at 3. That statement is simply not true. What Defendants offered was the full amount -- on condition that Plaintiff offer the security spelled out in their letter of December 19, 2002.

Second, <u>Hummell</u> directs us to consider the losing party's ability to satisfy a fee award. The record contains virtually no evidence on this issue. Neither the Plaintiff, nor the Defendant Plan, nor the Defendant Company, nor the individual Defendants can claim poverty or inability to satisfy a fee award. Plaintiff earned a substantial income while she was employed by The Weinberg Group. While her lump sum benefit may also appear substantial, we have no knowledge of whether that is her only asset or what her other financial obligations may be. As to the Defendants, there is very little information except that The Weinberg Group is a successful entity which helped corporations

obtain regulatory approval of their products or operations.  The one fact we know is that Matthew Weinberg was able to borrow $3 million when he wished to, in order to achieve full funding of the Plan.

Third, Hummell directs us to consider the deterrent effect of a fee award.  Awarding attorneys' fees to Plaintiff, no matter how modest an amount, would serve a significant deterrent effect in terms of achieving ERISA's purpose.  As the Court noted in Eddy, ERISA states that its purpose is "to protect . . . the interests of the participants in private pension plans and their beneficiaries."  59 F.3d 201, 207 (quoting 29 U.S.C. § 1001(c)) (emphasis in original).  It is extraordinarily difficult for one member of a pension plan to challenge the actions or calculations of that plan.  Fortunately for Dr. Becker, she had the resources to do it because she was such a highly paid and valued professional.  Individuals who earn far less money than Dr. Becker are not in a position to challenge the important decisions that plans and their administrators make.  If plans understood that clearly erroneous actions taken by them (such as placing restrictions on the payment of lump sum benefits) would be subject to attorneys' fees, that might well deter them from engaging in such conduct.

Fourth and fifth, Hummel directs us to consider the value of the victory to plan participants and beneficiaries, and the significance of the legal issues involved.  While ERISA determinations are always somewhat difficult, the Court does not believe that this case presented issues of overarching legal significance.  The relative merits of the two positions were very clear, and Defendants could offer little substantive rebuttal to Plaintiff's argument.  While we know that Dr. Becker herself benefitted greatly from receiving her unrestricted lump sum payment, the record does not contain any evidence about what other Plan beneficiaries may have received.

In conclusion, after weighing all of these factors, the Court concludes that Dr. Becker is entitled to an award of attorneys' fees. She achieved her two main goals: she got her lump sum benefit without restriction and she forced the Defendants to fully fund the Plan for the benefit of other beneficiaries. Those are precisely the kind of interests that ERISA was enacted to protect. Eddy, 59 F.3d at 201, 207. Without this litigation, neither statutory purpose would have been served.

**B.   The Amount of the Award**

The Court has carefully examined Plaintiff's request. In their Opposition, Defendants have identified several examples of what they deem to be unreasonable fees that Plaintiff seeks. While Defendants may not be correct in each and every instance, they do accurately note, for example, that an extraordinary amount of time was spent in researching the opposition to Defendants' Motion to Dismiss and in preparing the Motion to Disqualify (on both of which Plaintiff did, however, prevail). Similarly, a total of $26,569 is requested for 111 hours of discovery planning and discovery preparation, when neither a single deposition was taken nor a single response to written discovery was served.

Calculation of an award of attorneys' fees in a hotly litigated case such as this one may not be an art, but it certainly is not a science either. In considering Plaintiff's entire submission, as well as the lack of settled law in this Circuit as to whether Plaintiff is entitled to fees incurred in connection with the administrative claims procedure (totaling almost $60,000), the Court concludes

that awarding 50 percent of the requested fees is reasonable, and therefore, Plaintiff is awarded $130,390 for her Application for Attorneys' Fees [Dkt. #87].

May 21, 2008  /s/
                                      Gladys Kessler
                                      United States District Judge

**Copies via ECF to all counsel of record**